UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

MICHAEL DWAYNE BROUSSARD          CIVIL ACTION NO. 6:19-cv-00142

VERSUS                            JUDGE JUNEAU

COMMISSIONER OF THE               MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

## Administrative Proceedings

The claimant, Michael Dwayne Broussard, fully exhausted his administrative

remedies before filing this action. He filed an application for disability insurance

benefits, alleging disability beginning on March 5, 2015.[1] His application was

denied.[2] He then requested a hearing, which was held on September 12, 2017 before

---

[1]     The claimant originally alleged that his disability commenced on April 19, 2013. Rec.
Doc. 9-2 at 142, 144. His alleged disability onset date was later changed to March 5, 2015 to
correspond with his last day of work. Rec. Doc. 9-1 at 156.

[2]     Rec. Doc. 9-2 at 2.

Administrative Law Judge Janet Hollings.[3]  The ALJ issued an unfavorable decision on January 9, 2018, concluding that the claimant was not disabled within the meaning of the Social Security Act from March 4, 2015 through the date of the decision.[4]  The claimant asked the Appeals Council to review the ALJ's decision, and the Appeals Council granted that request.[5]  On August 7, 2018, the Appeals Council issued a partially favorable decision, finding that the claimant was disabled as of January 9, 2018 but not before.[6]  After the claimant asked for an opportunity to submit additional information, the Appeals Council vacated its August 7, 2018 decision and allowed the submission of additional evidence and argument.[7]  On November 30, 2018, the Appeals Council issued another decision, again finding that the claimant was disabled as of January 9, 2018 but not before that date.[8]  The Appeals Council's decision became the Commissioner's final decision for the purpose of judicial review.[9]  The claimant then initiated this action, seeking review of the Commissioner's decision.

---

[3]     A transcript of the hearing is found in the record at Rec. Doc. 9-1 at 126-157.

[4]     Rec. Doc. 9-1 at 70-81.

[5]     Rec. Doc. 9-1 at 28.

[6]     Rec. Doc. 9-1 at 28-32.

[7]     Rec. Doc. 9-2 at 21-22.

[8]     Rec. Doc. 9-1 at 10-15.

[9]     20 C.F.R. § 404.981; *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

## Summary of Pertinent Facts

The claimant was born on March 29, 1968.[10]  At the time of the ALJ's decision, he was two months and nineteen days shy of his fiftieth birthday.  At the time of the Appeals Council's final decision, however, he was fifty years old.  The claimant graduated from high school,[11] and he has relevant work experience as an automobile paint and body technician, including owning and operating his own business, Mike's Custom Shop, from 2003 to 2015.[12]  He alleged that he has been disabled since March 4, 2015 due to complex regional pain syndrome ("CRPS") of the right shoulder and arm, high blood pressure, high cholesterol, coronary artery disease, heart disease, sleep apnea, anxiety, depression, left carotid endarterectomy, right coronary stent, and double coronary bypass surgery.[13]

The claimant treated with Dr. Wayne T. Lindemann from January 2002 through July 2014.[14] Dr. Lindemann's records indicate that the claimant was injured in a work-related incident in February 2001 while carrying a car door.  Conservative treatment was unsuccessful, and the claimant underwent surgical intervention on his

---

[10]     Rec. Doc. 9-1 at 130; Rec. Doc. 9-2 at 3, 142.

[11]     Rec. Doc. 9-1 at 131.

[12]     Rec. Doc. 9-1 at 147; Rec. Doc. 9-2 at 176, 185, 223.

[13]     Rec. Doc. 9-2 at 3.

[14]     Rec. Doc. 9-3 at 187-275.

right shoulder.  Following surgery, however, he continued to complain of pain.  In March 2002, Dr. Lindemann diagnosed him with myofascial pain in the cervical region and complex regional pain syndrome of the right upper extremity.[15] Sympathetic nerve blocks did not relieve his pain.  He underwent occupational therapy and physical therapy; he had botox injections in the right scapula, right shoulder, and pectoralis areas;[16] he took muscle relaxants; and he took various types of pain medication.

In July 2004, the claimant was in a motor vehicle accident.  Dr. Lindemann diagnosed him with cervical whiplash syndrome, secondary to the motor vehicle accident, but described his complex regional pain syndrome as resolved.[17]  In August 2004, Dr. Lindemann diagnosed cervical strain,[18] which improved with physical therapy.  In October 2004, some symptoms of complex regional pain syndrome returned,[19] and the claimant continued to complain of right shoulder pain.  In July 2005, Dr. Lindemann found the claimant's symptoms to be compatible with an

---

[15]    Rec. Doc. 9-3 at 262.

[16]    Dr. James Domingue performed the botox injections.  Rec. Doc. 9-1 at 87-89 91.

[17]    Rec. Doc. 9-3 at 235.

[18]    Rec. Doc. 9-3 at 234.

[19]    Rec. Doc. 9-3 at 231.

overuse type syndrome.[20]  In November 2006, Dr. Lindemann's impression again was chronic complex regional pain syndrome, right upper extremity.[21]  In April 2008, the claimant continued to complain of right arm pain that was worsened with activity, and he requested medication to help him sleep.  In July 2008, he had no evidence of reflex sympathetic dystrophy[22] but he continued to complain of pain.[23] In October 2009,[24] Dr. Lindemann noted that the claimant had had a flare-up of right upper extremity pain with his reflex sympathetic dystrophy as well as overuse syndrome of the right upper extremity, and he listed the various medications that had been prescribed without relief.  In January 2010, Dr. Lindemann noted that, despite an exacerbation of symptoms with cold weather, the claimant's complex regional pain syndrome was under good control with medication.[25]

In July 2010,[26] the claimant told Dr. Lindemann that he had lost his balance at work, fallen backwards, and landed on his outstretched right arm and hand.  His

---

[20]    Rec. Doc. 9-3 at 226.

[21]    Rec. Doc. 9-3 at 221.

[22]    This is an older term for complex regional pain syndrome.  WebMD, http://www.webmd.com/brain/what-is-reflex-sympathetic-dystrophy-syndrome#1 (last visited October 21, 2019).

[23]    Rec. Doc. 9-3 at 214.

[24]    Rec. Doc. 9-3 at 209.

[25]    Rec. Doc. 9-3 at 208.

[26]    Rec. Doc. 9-3 at 206.

right grip was slightly weaker than his left but Dr. Lindemann noted that he was doing remarkably well on his current medications.

In April 2011,[27] Dr. Lindemann noted a flare-up of the claimant's complex regional pain syndrome, with increased pain, an increased sweat pattern, and poor sleep. Dr. Lindemann again adjusted the prescribed medications. In October 2011, the claimant was again having a flare-up of symptoms, and Dr. Lindemann recommended that he should consult with a pain management physician.[28]   In January 2012, the claimant reported that physical therapy and acupuncture had improved his range of motion and abnormal sweat pattern.[29]

In July 2012,[30] Dr. Lindemann noted that the claimant's medication regimen seemed to be working except when the claimant over-exerted himself. He also noted that the claimant was looking into seeking disability benefits but would prefer to continue operating his own business.

In October 2012,[31] the claimant reported to Dr. Lindemann that he had fallen in his shop and sustained multiple left rib fractures and subsequent left arm pain. He

---

[27]    Rec. Doc. 9-3 at 203.

[28]    Rec. Doc. 9-3 at 200-201.

[29]    Rec. Doc. 9-3 at 199.

[30]    Rec. Doc. 9-3 at 197.

[31]    Rec. Doc. 9-3 at 196.

continued to have some symptoms of complex regional pain syndrome, including a weakened right grip.  Dr. Lindemann described him as narcotic tolerant.

In January 2013,[32] the claimant reported to Dr. Lindemann that he had experienced acute pain to his right shoulder while under a truck installing a bumper. His right shoulder was depressed compared to the left, he had point tenderness, his range of motion in the right shoulder was limited, he was unable to touch the back of his neck or belt line, his right deltoid was weak, and he had an abnormal sweat pattern.  An MRI of his right shoulder obtained on January 21, 2013 showed mild rotator cuff tendinosis and arthritic changes at the AC joint but no recurrent biceps tendon tear, labral tear, or paralabral cyst.[33]

In October 23, 2013, the claimant saw cardiologist Dr. Jon D. Leleux and complained about fatigue, weakness, chest pain at rest, chest pain with exercise, heart palpitations, shortness of breath, and dizziness.[34]  The treatment note indicates that the claimant had undergone a carotid angiogram and left carotid endarterectomy in April 2013 and the placement of a stent in the right coronary artery in May 2013. Dr. Leleux's assessments included chest pain, fatigue/weakness, palpitations, tobacco abuse, hyperlipidemia, coronary artery disease, hypertension, and family

---

[32]    Rec. Doc. 9-3 at 195.

[33]    Rec. Doc. 9-3 at 194, 267.

[34]    Rec. Doc. 9-3 at 79-83.

history of heart disease.  In November 2013, Dr. Leleux ordered a sleep study, which revealed sleep apnea.[35]  According to the record, the claimant continued to treat with Dr. Leleux through early 2017.[36]  Some diagnostic testing was performed, and the claimant's medications were evaluated and modified periodically.

In April 2014,[37] the claimant reported to Dr. Lindemann that he was having difficulty working after left carotid artery endarterectomy and the placement of a cardiac stent.  His right arm was weak, and he continued to have an abnormal sweat pattern.  He was considering closing his business and applying for disability benefits. Dr. Lindemann again recommended that the claimant see a chronic pain management specialist.

In June 2014,[38] the claimant began treating with Dr. Joseph T. Gillespie for pain management and received trigger point injections.  Dr. Gillespie recommended that the claimant see a psychiatrist and referred him for a nerve conduction study. In August 2014,[39] Dr. James Domingue performed the nerve conduction study and electromyography ("EMG"), which showed a mild lesion of the right median nerve

---

[35]     Rec. Doc. 9-2 at 517-535; Rec. Doc. 9-3 at 74-78, 111, 115.

[36]     Rec. Doc. 9-3 at 3-121.

[37]     Rec. Doc. 9-3 at 188.

[38]     Rec. Doc. 9-2 at 304-305, 567-568.

[39]     Rec. Doc. 9-2 at 541-563.

at the wrist.  In September 2014, the claimant had a right-sided selective nerve root block, transforaminal epidural steroid injection at C4-5, performed by Dr. Gillespie.[40]  The claimant continued to see Dr. Gillespie into 2015.[41]

In July 2015, the claimant began treating with Dr. Robby LeBlanc for burning pain in his right hand.[42]  Upon examination, the claimant had good range of motion in his elbow and wrist, full strength and pulses in both hands, but a decreased light touch sensation in the right hand.  He also had a positive Tinel's sign, positive median nerve compression test, and positive Phalan's test in the right wrist.  X-rays were taken.  Dr. LeBlanc's assessment was right carpal tunnel syndrome with history of CRPS in the right upper extremity.  He administered a Celestone injection into the right carpal tunnel.  The claimant followed up with Dr. LeBlanc in August 2015,[43] reporting that the injection had not given him any relief.  Dr. LeBlanc repeated the tests of the right wrist, and this time, they were negative.  Still, Dr. LeBlanc discussed carpal tunnel release surgery with the claimant, and the claimant agreed to proceed with surgery.

---

[40]     Rec. Doc. 9-2 at 326-328.

[41]     Rec. Doc. 9-2 at 307-312, 566.

[42]     Rec. Doc. 9-2 at 340-341.

[43]     Rec. Doc. 9-2 at 342-343.

The claimant was hospitalized at Heart Hospital of Lafayette from September 21, 2015 through September 27, 2015.[44]   On September 21, he had a heart catheterization procedure that showed significant left main coronary artery disease. Two days later, Dr. Edmund Nagem performed a double coronary bypass surgery with bilateral internal mammary arteries.  The claimant's "postoperative course was complicated by difficulty with pain control. . . because of his long-term use of narcotics for his reflex sympathetic dystrophy."[45]  Upon discharge from the hospital, however, he stated that the pain medications previously prescribed to control his pain were adequate.[46]  After surgery, the claimant engaged in a cardiac rehabilitation program.[47]

On October 5, 2015, shortly after being released from the hospital, the claimant was seen by Gilbert L. Fontenette, a nurse practitioner in the office of Dr. Richard Fei.[48]   Assessments included chronic obstructive pulmonary disease ("COPD"), obstructive sleep apnea, snoring, excessive daytime sleepiness, and coronary artery disease.  A chest x-ray showed a postoperative chest with mild right

---

[44]    Rec. Doc. 9-2 at 378-504, 530-534; Rec. Doc. 9-3 at 44-45.

[45]    Rec. Doc. 9-3 at 44.

[46]    Rec. Doc. 9-3 at 45.

[47]    Rec. Doc. 9-2 at 517.

[48]    Rec. Doc. 9-3 at 147-152.

greater than left perihilar peribronchial thickening with low-grade scarring or atelectasis in the left lower chest but no congestive failure or pneumonia. The claimant had not been compliant with medication or with the use of a CPAP machine. His medication was adjusted, and a sleep study was ordered. He had recently stopped smoking. The sleep study of November 17, 2015 confirmed the claimant's sleep apnea, and he was advised to use a bipap machine.[49]

The claimant returned to see Dr. LeBlanc in November 2015.[50] His carpal tunnel surgery had been postponed because of the coronary bypass surgery. His complaints of numbness and tingling in his right hand remained, and he indicated that he wanted to proceed with the surgery. He had a positive Tinel's sign and a positive Phalen's test. On December 10, 2015, the claimant underwent right carpal tunnel release surgery, performed by Dr. LeBlanc.[51] When the claimant followed up with Dr. LeBlanc on December 23, 2015,[52] Tinel's sign was negative, and he was advised on post-surgical care of his hand and wrist.

---

[49]    Rec. Doc. 9-3 at 27-29.

[50]    Rec. Doc. 9-2 at 606-608.

[51]    Rec. Doc. 9-2 at 595.

[52]    Rec. Doc. 9-2 at 602-603.

The claimant returned to see Nurse Fontenette on January 27, 2016.[53] Spirometry testing showed mixed obstructive and restrictive lung disease with moderate airflow limitation but no significant bronchodilator response. He complained of shortness of breath and indicated that using the bipap machine had not helped his symptoms. The claimant followed up with Nurse Fontenette on August 3, 2016.[54] He complained about shortness of breath on exertion and fatigue. His medication regimen was continued.

The claimant received a right-sided cervical transforaminal epidural steroid injection at C4-5 from Dr. Gillespie on June 24, 2016,[55] and he continued treating with Dr. Gillespie through the end of October 2017.[56] Dr. Gillespie diagnosed him with cervical degenerative disk disease and occipital neuralgia, and he administered another right-sided cervical transforaminal epidural injection on October 18, 2017.

In February 2016, the claimant told Dr. Leleux that he had passed out while coughing and was unconscious for a few seconds.[57] In February 2017, the claimant reported another syncopal episode and complained of dizziness, low heart rate, and

---

[53]     Rec. Doc. 9-3 at 142-147.

[54]     Rec. Doc. 9-3 at 139-141.

[55]     Rec. Doc. 9-3 at 131.

[56]     Rec. Doc. 9-3 at 124-128, 181-185.

[57]     Rec. Doc. 9-3 at 20.

dyspnea on exertion related to COPD.[58]  The problem list in Dr. Leleux's treatment note was revised to show bilateral carotid artery stenosis instead of carotid disease.[59]

In August 2016, an MRI examination of the claimant's cervical spine showed mild right foraminal narrowing at C3-4 and C4-5 secondary to asymmetric uncovertebral hypertrophy, minor posterior annular bulges without central spinal canal stenosis, and a rounded T2 hyperintense lesion within the right supraclavicular fossa.  Further study including ultrasound was recommended.  EMG and nerve conduction studies of the claimant's right arm were normal in September 2016.[60]

The claimant again followed up with Nurse Fontenette on February 22, 2017.[61]  He was using a bipap machine for sleep apnea, which reportedly caused nasal burning.  He reported worsening COPD symptoms and stated that he had been evaluated by Dr. Leleux with regard to cough-induced syncope.  He claimed to be taking his medications as prescribed without side effects.  A chest x-ray showed his lungs were well expanded and free of any acute infiltrates or effusions.  He was prescribed Brovana to be taken by nebulizer twice daily and Atrovent to be taken by nebulizer four times daily.

---

[58]    Rec. Doc. 9-3 at 3.

[59]    Rec. Doc. 9-3 at 7.

[60]    Rec. Doc. 9-1 at 101.

[61]    Rec. Doc. 9-3 at 135-138.

The claimant also received treatment for mental health issues from a psychiatrist, Dr. Nicole Dickens of Dickens Inspired & Associates, from 2014 through 2017.[62] He complained of anxiety, stress, depression, moodiness, isolation, irritability, poor sleep, and fatigue as well as his physical problems. Many of these problems related to his physical pain complaints and his decision to sell his business. He was prescribed various psychotropic medications, some of which caused side effects, until Cymbalta was settled upon. Dr. Dickens diagnosed major depressive disorder, single episode, severe, without psychotic features and generalized anxiety disorder. In a medical source statement dated October 3, 2017, Dr. Dickens opined that the claimant was not capable of performing a full time job without an unacceptable rate of absenteeism.[63]

The claimant received psychotherapy from licensed professional counselor Misty Hencke of Hope Healing Joy Counseling Center, LLC from October 17, 2017 through October 31, 2017.[64] He was diagnosed with adjustment disorder, with mixed anxiety and depressed mood. Ms. Hencke noted that the claimant's mood was depressed, his functional status was intact, and his affect was appropriate. Additionally, his insight was good, his judgment was good, his memory was intact,

---

[62]    Rec. Doc. 9-2 at 345-369, 372-374; Rec. Doc. 9-3 at 157-168, 170-172.

[63]    Rec. Doc. 9-3 at 170-172.

[64]    Rec. Doc. 9-3 at 174-179.

his attention and concentration were good, his thought content was appropriate, his perception and flow of thought were unremarkable, and his speech was normal.

In a pain and symptom report dated November 19, 2015,[65] the claimant explained that he underwent a right shoulder repair operation in approximately September 2001 and was later diagnosed with regional complex pain syndrome or reflex sympathetic dystrophy ("CRPS/RSD") of the right upper extremity. He stated that this syndrome includes constant burning pain, excessive sweating, and swelling of his right head, neck, shoulder, arm, and hand with a progressive loss of mobility, loss of strength, and loss of the ability to grip. He indicated that his functionality was further limited by heart disease. Additionally, he claimed that the worsening of his symptoms despite myriad medical procedures over a period of fourteen years had led to depression and the inability to perform his job duties. From approximately June of 1990 to April of 2002, he worked for Bobby's Paint & Body Shop doing automobile window tinting, painting, and body repair. He stated that he was laid off due to injury in April 2002. He then opened his own business, which he operated from September 2003 until March 2015.

In a function report dated November 24, 2015,[66] the claimant explained that surgery in April 2001 to reattach his right biceps tendon developed into CRPS/RSD

---

[65]    Rec. Doc. 9-2 at 183-188.

[66]    Rec. Doc. 9-2 at 189-195.

15

that progressively worsened over time, with increased pain, decreased strength and mobility, and degenerative changes to his right arm and neck despite many medical procedures. He also stated that, following left carotid artery surgery in April 2013, his overall health deteriorated, requiring a heart stent in May 2013 and emergency double bypass surgery in September 2015, and allegedly resulting in increased mental confusion, anxiety, and loss of short term memory compounded by the side effects of his medications resulting in falling and fainting injuries.[67] Additionally, sleep apnea resulted in fatigue. He described dizziness, light-headedness, fatigue, memory loss, and confusion. While he stated that he continued to take his son to school, prepare simple breakfasts and lunches, and care for pets, he further stated that he was no longer able to hunt, fish, or hold and control equipment for painting, sanding, or buffing automobiles due to loss of feeling in his arm and hand with overhead work and the loss of strength and feeling in his right arm and hand. He described multiple sleep interruptions due to muscle spasms and pain as well as sleep apnea. At the time of the report, he was undergoing cardiac rehabilitation, including use of a treadmill, exercise bike, and light weights. He stated that memory loss, fatigue, health problems, and multiple medical procedures had affected his ability to concentrate and resolve complex problems. He claimed that he developed anxiety

---

[67]     There are no indications in cardiologist Dr. Leleux's treatment notes that the claimant ever complained about memory loss, confusion, or an inability to concentrate.

and depression due to not being able to continue operating his business, fear of not being able to support his family, and fear of dying young.

On September 12, 2017, the claimant testified at a hearing regarding his symptoms and medical treatment.  He testified that he stopped working in March 2015 and sold his paint and body shop in July 2015.[68]  He stated that his right shoulder was limited in motion and strength, and that he could lift his right arm about shoulder height but no higher.  He stated that he has constant burning pain from his right hand all the way up his right arm into his neck, the top of his head, down his spine, and down his right leg.  He testified that after a procedure for coronary artery disease in September 2015, he experienced shortness of breath, severe sleep apnea, lack of sleep, fatigue, high blood pressure, and passing out.  He stated that he had blacked out while coughing or standing up too quickly about four to five times in the previous year.  He confirmed that Dr. Leleux prescribes medication for coronary artery disease, high blood pressure, high cholesterol, and high blood sugar.  He stated that he takes six breathing treatments by nebulizer each day for COPD.  He stated that he uses a bipap machine for sleep apnea.  He complained that his medication makes him drowsy and tired and sometimes upsets his stomach.  He confirmed that he was taking Cymbalta for depression, which was helping somewhat.  He stated

---

[68]    However, he reported to his psychiatrist Dr. Dickens that he sold the business in 2016. Rec. Doc. 9-3 at 163.

that his pain is more troubling than his depression, that he is most comfortable lying down, that he is able to sit for only thirty to forty-five minutes without needing to stand up, and that he can stand for no longer than an hour at a time.  He confirmed having right biceps surgery in 2001 and carpal tunnel release surgery in December 2015.  He stated that he gets injections every eight weeks for his hand and arm pain. He stated that he was taking Norco for pain, Flexeril for muscle spasms in his right biceps, right shoulder, and right shoulder blade.  He stated that he could walk for only about fifteen or twenty minutes and would then need to use an emergency inhaler.  He confirmed having had suicidal thoughts before starting to see Dr. Dickens.  He stated that sometimes his depression caused him to stay in bed about two days per week.  He also stated that he had memory loss.  At the time of the hearing, the claimant was being prescribed sixteen different medications:  Atenolol for high blood pressure; Cymbalta for depression; Xanax for anxiety, stress, and panic attacks; Norco for pain; Elavil for pain; Buspar for anxiety and depression; Plavix to prevent blood clots in his stent; Crestor for high cholesterol; Norvasc for high blood pressure; Cialis for erectile dysfunction; Zetia for high cholesterol; Fenofibrate for high blood sugar; Baclofen for restless leg syndrome and muscle spasms; Pro air inhaler for shortness of breath; Brovana for COPD; and Ipratropium Bromide and Albuterol for COPD.

The claimant now seeks reversal of the Commissioner's partially adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[69] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[70] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[71]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[72]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the

---

[69]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[70]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[71]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[72]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

evidence or substituting its judgment for that of the Commissioner.[73]  Conflicts in the evidence[74] and credibility assessments[75] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[76]

## B.    **Entitlement to Benefits**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[77]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

---

[73]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[74]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[75]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[76]    *Wren v. Sullivan*, 925 F.2d at 126.

[77]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

twelve months."[78]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[79]

## C.    Evaluation Process and Burden of Proof

A sequential five-step inquiry is used to determine whether a claimant is disabled.  This process requires the Commissioner to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[80]  Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[81] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in

---

[78]    42 U.S.C. § 1382c(a)(3)(A).

[79]    42 U.S.C. § 1382c(a)(3)(B).

[80]    20 C.F.R. § 404.1520.

[81]    20 C.F.R. § 404.1520(a)(4).

the record.[82]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[83]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[84]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[85]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[86]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[87]

---

[82]    20 C.F.R. § 404.1545(a)(1).

[83]    20 C.F.R. § 404.1520(e).

[84]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[85]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[86]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[87]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

## D.    <u>The Appeals Council's Findings and Conclusions</u>

In this case, the Appeals Council determined, at step one, that the claimant has not engaged in substantial gainful activity since March 4, 2015.[88]  This finding is supported by substantial evidence in the record.

At step two, the Appeals Council found that the claimant has the following severe impairments:  "hypertension; COPD; centrilobuar emphysema; occipital neuritis; reflex sympathetic dystrophy (RSD) of the upper right extremity; coronary artery disease; status post coronary artery bypass X2, with bilateral internal mammary arteries; and cervical disc disease."[89]  This finding is supported by substantial evidence in the record.

At step three, the Appeals Council found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[90]  The claimant did not challenge this finding.

The Appeals Council found that the claimant has the residual functional capacity to perform a reduced range of sedentary work.[91]  More particularly, the Appeals Council stated that the claimant needs work that allows him to alternate

---

[88]    Rec. Doc. 9-1 at 13.

[89]    Rec. Doc. 9-1 at 13.

[90]    Rec. Doc. 9-1 at 13.

[91]    Rec. Doc. 9-1 at 13-14.

siting and standing positions every sixty minutes for one to two minutes while remaining a the workstation and no change in the work process; he can occasionally climb ramps or stairs, balance, stoop, kneel, and crouch; he can occasionally reach overhead with his right upper extremity and occasionally handle with the right (dominant) hand; and he must avoid hazards in the workplace such as unprotected heights and moving mechanical parts. The claimant disputed this finding.

At step four, the Appeals Council found that the claimant is not capable of performing his past relevant work and has no transferable skills.[92] The claimant did not dispute this finding.

At step five, the Appeals Council found that the claimant was disabled as of January 9, 2018 based on a change in age category but was not disabled before that date.[93] The claimant challenged this finding.

## E.    **The Allegations of Error**

The Appeals Council applied the Medical-Vocational Rules ("the Grids") to find that the claimant became disabled on January 9, 2018, the date of the ALJ's decision. Grid Rule 201.14 directs a finding of disabled on a claimant's fiftieth birthday when his skills are not transferable and his residual functional capacity limits him to sedentary work. The ALJ's decision was rendered just two months and

---

[92]    Rec. Doc. 9-1 at 14.

[93]    Rec. Doc. 9-1 at 14.

24

nineteen days before the claimant's fiftieth birthday, and the ALJ found (as did the Appeals Council) that he was limited to sedentary work.  In this borderline age situation, it was appropriate for the Appeals Council to find that the claimant was disabled as of the date of the ALJ's decision.[94]  The claimant failed to show that any error was made in applying Rule 201.14 in this case.

The claimant contends, however, that the Appeals Council erred in finding that there were jobs in the national economy that he could perform between his alleged disability onset date in 2015 and January 9, 2018, the date on which the Appeals Council found him to be disabled.  In particular, the claimant argued that he cannot raise his right arm above shoulder level, has pain to the right side of his neck into his head, has constant burning pain into his right hand and fingers, and has difficulty picking up coins, turning door knobs, and opening medication bottles with his right hand.  He also argued that he has difficulty remembering things and sometimes stays in bed a few days a week due to fatigue, pain, or depression. Finally, he argued that he takes several medications that interfere with his ability to concentrate.  For these reasons, the claimant contends that he was unable to perform

---

[94]    20 C.F.R. §§ 404.1563(b) ("We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case."),  416.963(b) (same). See, also, *Stanridge-Salazar v. Massanari*, 254 F.3d 70, *1 (5th Cir. 2001) (per curiam), "the Commissioner has significant discretion to determine when a situation is borderline."

the duties of full-time employment on a sustained basis during the relevant time period.

The claimant's primary complaint is pain. Although the claimant's treatment has not eliminated his pain, the inability to work without some pain or discomfort does not mean that an individual is disabled.[95] To be disabling, a claimant's pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment.[96] Although the claimant testified at the hearing that he has constant pain, he also stated that he was able to sit comfortably for a period of up to forty-five minutes before having to change position. Further, the record contains many instances in which treatments for pain were beneficial to the claimant. For example, in June 2015, the claimant reported to Dr. Dickens that a steroid injection relieved his pain for about seven days.[97] In January 2017, he told her that a Lidocaine injection had resulted in a couple of weeks of pain relief.[98] Throughout the relevant time period, the claimant treated with his pain management specialist, Dr. Gillespie, and Dr. Gillespie continued to offer and administer a variety of medications and procedures designed to ameliorate the claimant's pain. In August 2015, the claimant reported to Dr.

---

[95]   *Hames v. Heckler*, 707 F.2d at 166.

[96]   *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

[97]   Rec. Doc. 9-2 at 347.

[98]   Rec. Doc. 9-3 at 160.

Gillespie that he had experienced seven to ten days of pain relief after a cervical steroid injection.[99]  In April 2017, he reported that a cervical injection the previous January had relieved his pain for a week.[100]  In June 2017, he reported that the last procedure had relieved his pain for a few weeks.[101]  In September 2017, he reported that the prior procedure had helped a lot.[102]  Accordingly, there is substantial evidence in the record to support the Appeals Council's finding that the claimant's pain was not disabling.  Furthermore, an MRI of the claimant's cervical spine from August 2016 showed only mild abnormalities,[103] and an EMG and nerve conduction studies of his right arm from September 2016 were normal,[104] evidencing a lack of an objective basis for the claimant's complaints of pain in his neck and right arm. Although the claimant does have an array of objectively documented conditions that can cause pain, there is substantial evidence in the record suggesting that his pain complaints are not entirely consistent with the diagnosed impairments.

---

[99]    Rec. Doc. 9-2 at 310.

[100]    Rec. Doc. 9-3 at 125.

[101]    Rec. Doc. 9-3 at 124.

[102]    Rec. Doc. 9-3 at 184

[103]    Rec. Doc. 9-3 at 94-95.

[104]    Rec. Doc. 9-1 at 101.

At the hearing, the claimant was not asked any questions about his typical day or the tasks that he can or cannot perform other than sitting, standing, and driving. Therefore, no evidence was presented in the form of hearing testimony to refute the functional capacity he described in his function reports from 2015.  When he submitted the function reports, the claimant was able to prepare simple meals (including breakfast and his son's lunch), prepare food by grilling for as long as two hours at a time, care for his pets (including feeding and watering two dogs and cleaning their kennel), maintain his yard with a riding lawnmower, handle the family's trash, drive his son to and from school every day, and shop both in stores and online for vehicle maintenance supplies, pool supplies, and pet supplies. Furthermore, in September 2017, he told Dr. Dickens that he preferred when his son was in school because it provided a routine framework for his own day and improved his depression.[105]  At that time, he was getting his son up in the morning, taking him to school, and helping around the house.  The Appeals Council accommodated the claimant's impairments in its residual functional capacity finding by requiring that he must be able to alternate sitting and standing regularly and can only occasionally reach overhead with his right arm and only occasionally handle with his right hand. Jobs in the national economy that can be accomplished by someone with these

---

[105]      Rec. Doc. 9-3 at 157.

28

limitations were identified by the vocational expert at the hearing.  Therefore, there was substantial evidence in the record supporting the Appeals Council's conclusion that the claimant retained the functional capacity to work at a modified sedentary level before January 2018 as well as evidence that jobs matching that functional capacity exist in significant numbers in the national economy.

While the claimant acquiesced to Dr. Gillespie's recommendation that he see a psychiatrist for medication to treat his mental health symptoms, he was resistant to psychotherapy, refusing to participate in group therapy and only starting individual therapy in 2017.  During the relevant time period, the psychiatrist, Dr. Dickens, consistently described the claimant's mental health as either "improving," "fair," or "stable."  At the hearing, the claimant testified that his depression had improved after he began taking antidepressant medication.[106]  This is also reflected in Dr. Dickens's treatment notes.[107]  An impairment that can reasonably be remedied or controlled by medication or therapy is not disabling.[108]  Therefore, the claimant failed to show that the Appeals Council erred in adopting the ALJ's findings with regard to the claimant's mental health impairments.

---

[106]    Rec. Doc. 9-1 at 138.

[107]    Rec. Doc. 9-3 at 162.

[108]    *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

The claimant complained that his difficulties with memory and concentration prevent him from working on a sustained basis. But the claimant's subjective complaints about his memory and ability to concentrate are at odds with the evidence in the record. Dr. Leleux's treatment note from March 10, 2015, indicates that the claimant denied any memory loss.[109] In October 2017, when the claimant was evaluated by Ms. Hencke, the licensed professional counselor, she found that his memory was intact and his ability to concentrate was good.[110] There are no references in Dr. Dickens's treatment notes to problems for the relevant time period with regard to memory or concentration. There is no evidence, aside from the claimant's subjective complaints, that his memory and concentration are impaired.

In summary, the claimant failed to carry his burden of proving that he was disabled before January 9, 2018.

## Conclusion and Recommendation

IT IS THE RECOMMENDATION of this Court that the decision of the Commissioner be AFFIRMED and that this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of

---

[109]    Rec. Doc. 9-3 at 60.

[110]    Rec. Doc. 9-3 at 178.

Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[111]

Signed in Lafayette, Louisiana, this 23rd day of October 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[111]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).